**Willie ALLEN et al., Plaintiffs,**

v.

**The CITY OF MOBILE, a municipal corporation, et al., Defendants.**

**Civ. A. No. 5409–69–P.**

United States District Court,
S. D. Alabama, S. D.

Sept. 9, 1971.

A. J. Cooper and Vernon Z. Crawford, Mobile, Ala., Jack Greenberg and Jeffery Mintz, New York City, for plaintiffs.

Mylan R. Engel, Fred G. Collins, William H. Brigham, City Atty., Mobile, Ala., for defendants.

## ORDER AND DECREE

PITTMAN, Chief Judge.

Plaintiffs, black police officers of the City of Mobile, brought this class action on behalf of all Negro officers on the police force. Jurisdiction is alleged under 28 U.S.C.A. §§ 1331 (Federal Question; Amount in Controversy; Cost), 1343(3), 1343(4),[1] (Civil Rights and

---

1. "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 * * *

 (3) To redress the deprivation, under *color of any State law*, statute, ordinance, regulation, *custom* or *usage*, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

Elective Franchise), 2201,[2] (Creation of Remedy), 2202 (Further Relief), and 42 U.S.C.A., §§ 1981 (Equal Rights Under the Law), and 1983 (Civil Action for Deprivation of Rights). They seek a declaration of their rights and appropriate injunctive relief against practices, policies, and customs of the several defendants which have the purpose and effect of denying to them, as a result of race, the equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States Constitution and implementing statutes.[3]

Plaintiffs allege they are assigned to patrol duties and to other work in the City of Mobile Police Department on the basis of race rather than ability. This pattern and practice of assignment results in Negro officers being excluded from patrol duties in predominantly white areas of the city [4] and from assignment to many divisions of the City of Mobile Police Department, hereinafter referred to as Department, particularly those concerned with administration. Negroes, it is alleged, are not assigned to ride in cars with white policemen as partners.[5]

The County Personnel Board, hereinafter referred to as Board, allegedly discriminates by administering promotional examinations which are not job related and by allowing racial bias to enter into the rating of individual patrolmen.[6] Plaintiffs further allege they are denied a fair opportunity for promotion in the Department as a result of these tests and promotional requirements which have the purpose and effect of discriminating against them on the basis of race.[7]

The defendant City of Mobile contends that the hiring and promotion of police officers by the Department is made solely from eligibility lists established pursuant to State law by the Personnel Board, is not based on race, and does not deny the plaintiffs their rights under the Fourteenth Amendment. They further contend the assignment of officers to various divisions, including the Patrol Division, is based solely on need and the ability of the various personnel of the Department; and, that the customs and practices of the Department do not violate denial of equal protection under the Fourteenth Amendment.[8]

The defendants, Personnel Board and Director, act under a state law which puts the governing and control of personnel for Mobile County under the Civil Service Rules, Regulations and Practices. The Personnel Board consists of three members who serve staggered terms. The Director is elected by the Board and serves at its pleasure. The Director is executive head of the Personnel Department and is charged with the direction and supervision of its administrative and technical activities such as the administration and execution of the classification plan for the classified service. He also computes employee service ratings, conducts tests, formulates employment

(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights * * *." (Emphasis added.)

2. " * * * any court of the United States, * * * may declare the rights * * * of any interested party seeking such declaration, * * *."

3. See court file this case, response filed September 10, 1970, of plaintiff to the court's preliminary pretrial order, defining the issues.

4. Plaintiffs' original complaint alleged that the boundaries of the patrol zones were gerrymandered so that any one particular zone could easily be identified white or black. At the pretrial conference this allegation was dropped and plaintiffs stated it would not be an issue.

5. See Footnote 3, supra.

6. Members of the plaintiffs' class have expressed the fear that overt discrimination entered into the processing of promotional examinations, that is, 'they fear that graders cheat and give blacks lower scores than actually earned. The attorneys for plaintiffs have stipulated that this is not an issue in the case.

7. See Footnote 3, supra.

8. See Footnote 3, supra.

registers, and certifies persons qualified for appointment, promotion and pay plans.

These defendants contend the Civil Service System has been administered fairly and impartially in accordance with the laws and rules governing the system. They assert they have neither enforced nor maintained any regulations, policy, custom or usage which discriminates against Negro police officers, nor have they deprived or attempted to deprive them of the full use and enjoyment of their rights as Civil Service employees, nor have they denied them equal opportunity to compete for positions in the public service.

## FINDINGS OF FACT

As of the date of trial the Mobile Police Department consisted of 282 sworn officers of which 35 were Negro. There were 43 sergeants of whom one was a Negro. There were 22 officers above the rank of sergeant, none of whom were black. This leaves a total of 217 sworn officers below the rank of sergeant of which 34 are Negro.

There are 107 whites and 23 Negroes assigned to the Patrol Division. This is approximately a five to one ratio of whites to blacks.

The City is divided into 18 zones or beats. Eight zones are predominantly black, one zone is 50% white–50% black, and nine zones are predominantly white.[9]

The Patrol Division covers these zones with 24 to 27 cars per shift. There is a general policy of the City to have one-man patrol cars; however, at any given time there are approximately ten patrol cars carrying two persons. Two or three cars will usually carry two officers because one of them is recovering from an illness or has a permanent health impair-

ment. The other two-man patrol cars will carry recruits in a training program. The cars have been segregated; whites paired with whites and blacks paired with blacks. Prior to the filing of this lawsuit Negroes were assigned exclusively to the predominantly black zones. Since then, there have been some transfers of Negroes to predominantly white zones.

Prior to the filing of this lawsuit Negro officers had never been assigned to the Docket Room Division, Traffic Division, Records Division, Municipal Court, Training Division, nor Planning Division. Recently, however, black patrolmen have been assigned to the Docket Room and the Traffic Division.

Usually officers have been assigned to the Municipal Court because of some physical impairment. At the present time the court is staffed by civilians with the exceptions of two bailiffs who are sworn officers. One has a history of heart attacks, and the other is recovering from a serious operation. When vacancies occur in the future these vacancies will be filled by civilians and not sworn police officers.

The Records Division consists of one officer who is required to have the rank of lieutenant. The Planning Division consists of a captain and a lieutenant. The Training Division consists of a captain, a lieutenant, and a sergeant. The Planning and Training Divisions require officers with special expertise.

■ One of the plaintiffs, who also appeared as a witness, has requested, and was refused, an assignment to the Training Division. He attended junior college for two years and has had experience as a teacher. He took the sergeants examination in 1968 and scored 64.60%. The passing mark was 70%. Out of 108 taking this examination, 59 passed.[10] Con-

---

9. See Defendant, City of Mobile, Exhibit No. 12.

10. See Plaintiffs' Exhibit No. 10. There were nine vacancies to be filled. The 1962 National Chief of Police Association report on Mobile recommended the passing

score be raised and the test be made more difficult. See Defendants' Exhibit No. 17. The State Civil Service statute requires that all who make 70% be passed. A flexible passing point below 70 is used. Two factors are considered: (1) the number of vacancies to be filled and (2)

sidering his grade and rank on the sergeant's examination, and the court's observation of him as a witness, it appears to the court that his abilities are not commensurate with the qualifications of the position, and concludes the refusal of his request for assignment to the Training Division was non-discriminatory.

 No other evidence was offered to substantiate a claim of discrimination against Negro members of the Police Department in these three divisions. The men serving in these positions are competent and obviously have expertise beyond the scope of any of plaintiffs' witnesses. The thrust of plaintiffs' evidence becomes statistical. The plaintiffs have failed to demonstrate that the City's requirement that officers with these ranks and their respective skills to fill these positions is arbitrary or done to prevent blacks from serving in these jobs. The court concludes that there has been no racial discrimination by the Department's assignment to these divisions.

The Traffic Division and the Docket Room are different matters. In the former there is one Negro compared with 31 white patrolmen; in the latter, there is on Negro compared with 11 white patrolmen. It is noted that as of May 1971.[11] there were 161 white patrolmen and 34 Negro patrolmen; or 82.6% of the patrolmen were white while 17.4% are black. Though 17.4% of the patrolmen are Negro, only 3.1% of the patrolmen assigned to the Traffic Division and only 8.3% assigned to the Docket Room are black.[12] The Traffic Division is made up of volunteers who know how to ride a motorcycle. The Department does not give instruction or training in the operation of this vehicle. Only one Negro has applied for assignment to this division who could operate a motorcycle. He was assigned to the division.

There has been a consistent pattern of assigning black officers only to cases in which either the victims or the suspects were black. This constitutes assignment of cases on a racial basis. Prior to the filing of this lawsuit no efforts were made to determine whether or not black officers could effectively handle case assignments where the victims and suspects were white nor if they could effectively patrol predominantly white zones, nor conversely, whether or not white officers could effectively patrol predominantly Negro areas and investigate cases involving black victims and suspects.

The court notes that there were no black police officers prior to 1954, and the crime rate in all areas of the city is higher now than then. This indicates that in general white officers can effec-

---

the motivation and incentive factor to encourage large numbers to take the examination, but the passing point is kept high enough for the examination to have some validity as a measuring device.

11. See City of Mobile Exhibit No. 12. The variance of this figure with the figures at trial time is explained by the constantly changing number of sworn officers due to deaths, resignations, and recruitment.

---

12. There is approximately a 5 to 1 ratio of whites to blacks.

| Division or Section | White | | Negro | |
|---|---|---|---|---|
| | Number | % | Number | % |
| Patrol Div. | 110 | 81.5 | 25 | 18.5 |
| CID * | 4 | 44.5 | 5 | 55.6 |
| Traffic Div. | 31 | 96.9 | 1 | 3.1 |
| Juvenile Div. | 5 | 71.4 | 2 | 28.6 |
| Docket Room | 11 | 91.7 | 1 | 8.3 |

\* CID generally operates with "Detectives." This is a rank which for pay purposes is considered equal to sergeant. These figures reflect only the number of *patrolmen* assigned to CID. These patrolmen perform the duties of detectives but are paid as patrolmen and their duties may be considered temporary. There are no Negroes who hold the rank of detective.

tively patrol predominantly Negro areas and investigate cases which have Negro victims and Negro suspects. The evidence fails to convince the court the converse would not be true.

### Defendants Mobile County Personnel Board and Director Pierce.

The Mobile County Personnel Board is charged by law with providing qualified personnel for the county and City of Mobile. This includes the City of Mobile Police Department. The Board administers the promotional program and furnishes the Police Department an eligibility list from which to select its personnel. The eligibility list contains more names than the Department anticipates it will need. The list is good for only one year unless extended by the Personnel Board. The last sergeants eligibility list has been used since 1968.[13] The names on the eligibility list are ranked according to the total scores of the applicants, the first name on the list being the highest scorer. As a matter of policy, in re-

cent years the Police Department has taken the first name on the list although under the rules the selection may be made from the three top ranking persons. This policy in theory and practice has been without racial overtones.

The applicant's scores and hence the eligibility list, is arrived at by taking the officer's scores on four factors, multiplying each by a percentage and adding the four scores together to get the officer's total score. The factors and the weights given to each are: (1) written examination—60%; (2) seniority—20%; (3) regular service ratings—10%; and, (4) special service ratings—10%.[14]

The facts as developed concerning these factors are as follows:

(1) *Written examination.* This test purportedly examines the individual on those areas of police science or duties which will be needed in the higher rank. It allegedly measures the knowledge he has gained in those areas by study and

---

13. A sergeants examination scheduled to take place just before the trial was enjoined pending the decision in this case.

14. An applicant can make up to 100 on each of the four factors. His score on each is multiplied by the percentage assigned to that factor and added to his other three adjusted scores to get his total. Thus, if an officer makes the following scores:

| 1. Written test | 80 |
|---|---|
| 2. Seniority | 90 |
| 3. Regular Service Rating | 80 |
| 4. Special Service Rating | 70 |

his total score would be computed:

| 1. Written | 80 x .60 — | 48 |
|---|---|---|
| 2. Seniority | 90 x .20 — | 18 |
| 3. Regular | 80 x .10 — | 8 |
| 4. Special | 70 x .10 — | 7 |
| | Total Score | 81 |

This method of computation is referred to as the straight percentage method. It has been demonstrated, however, that the straight percentage method does not adjust the score for "Standard Deviation" and thus yields different weights than that assigned. By computing the standard deviation, (a statistical standard deviation is a measure of how wide the scores are spread) to the 1968 sergeants examination and adjusting the scores on that basis,

the weights actually given to the factors were:

| 1. Written test | 54% |
|---|---|
| 2. Seniority | 29.7% |
| 3. Regular Service Rating | 5.9% |
| 4. Special Service Rating | 9.5% |

To compute a standard deviation on each test would require the work of an expert statistician. To be theoretically sound the standard deviation would have to be computed on each new examination. To take the standard deviation of a past examination and assign weights to be applied to a future examination would distort the result.

Large numbers of applicants take these examinations for relatively few vacancies. Most of the men have the equivalent of a high school education. The computing of a standard deviation is difficult to explain. An application of the standard deviation by the plaintiffs' expert to the 1968 tests *did not significantly change* the relative position of the black applicants. The present straight line computation is racially neutral. It was not intended, nor does it have the effect of preferring one race over the other. Because the use of standard deviations and adjustment of places on the eligibility list would be complicated and difficult to explain, the court does not consider its use desirable.

experience so it is an achievement rather than an aptitude test.

The plaintiffs rely primarily on an expert witness, Dr. Richard S. Barrett, an industrial and educational psychologist now employed by the City University of New York, New York City. He received his Doctor of Philosophy in Industrial Psychology in 1956 and has been active in that field since that time as a teacher and consultant for the government and industry. He is knowledgeable, intelligent, and active in a newly developing field relating to the evaluation of tests for culturally and socially deprived minorities, principally Negroes. His particular expertise is in testing techniques and recommendations after a study of job needs. It includes the selection and use, developments, design, validation of selection tests, and other procedures. It also includes rating of individuals on the basis of their performance. To evaluate a particular examination testing procedure, he testified he should get a job description of the job covered. He should learn about the labor market, the organizational structure, and other things that are peculiar to that particular institution based on an in-depth study. He bases his evaluation of the test at issue in this case on only a job description for sergeants.[15] He criticized the job description as being inadequate. He had not familiarized himself with the size nor structure of the Mobile Police Department.[16] His familiarity with Police Departments and their work is limited to a study of a report on the Chicago Police Department and an examination of police examinations of the Boston Police Department plus what he has read in the newspapers and general lay knowledge. He further testified that for a proper evaluation of a test and the construction of a new test, it would require an in-depth study by professionals costing not less than $30,000 and probably considerably more.

He has examined the 1968 sergeants examination, the service ratings, the results of the examinations, and a deposition of the defendant Personnel Director Pierce. It was his judgment that the test had facial validity but was biased on such things as verbal skills, memory, language, reading ability and comprehension. He criticized the test for emphasizing only one small segment of those things which go into making a successful policeman. The witness urges that job performance and job behavior are the most important things. This would be reflected in service ratings and depend on the evaluation of supervisors.[17]

He testified other means of testing socially and culturally disadvantaged minority ethnic groups are in their infancy. His suggestions are innovative and the possibilities tend to excite the imagination, but are untested and unproven. The court finds there is insufficient evidence at the present time backed up by validation procedures to evaluate alternative testing procedures.

---

15. This job description was prepared in 1959 by Griffin, Hagen & Associates, a nationally recognized public personnel consultant and authority.

16. He was under a general impression that the defendant Police Department had between 3,500 and 4,000 and 250 Police sergeants, whereas the total force is 282 with 43 sergeants.

17. " * * * in a society where racial prejudice is endemic, an enormous policing effort would be required to insure that subjective standards do not harm minority workers." Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L.Rev. 1165.

This court, in a school desegregation case, has observed the same difficulty with subjective tests. Where patterns of racial discrimination developed in the classrooms, the court prohibited the use of teacher evaluations for classroom assignment. U.S.A., Danita Hampton v. Choctaw Co. Bd. of Ed. et al., S.D.Ala., No. 4246–66 (9/21/70).
"The examination [journeyman's] shall be an *objective* one designed to determine whether the applicants are reasonably qualified." United States v. Sheet Metal Wkrs. Int. Assn., Local U. No. 36, 416 F.2d 123, 133 (8th C.A.1969) (Emphasis added.)

His principal criticisms of the Mobile sergeants tests are (1) they are likely to have an adverse racial impact due to poor test taking ability and the low threshold of test fear for blacks; (2) the test has only one facet—book learning; (3) the test was not validated; (4) they give insufficient consideration to past job performance and the promotion is coupled to a senority factor which is tied to past discrimination. He particularly criticizes the test as discriminatory because of the "ability to read" and "to understand words" aspect which has an adverse impact against the socially and culturally disadvantaged minority groups.

The sergeants examination was prepared by the National Public Personnel Association of Chicago.[18] The defendants' witness, Dr. Donovan, has been with that organization since 1939. He had previous experience with the Arkansas state personnel organization and the Chicago Civil Service Commission.

The Association's membership is composed of public personnel associations from cities, counties, states, and federal, as distinguished from private industry. The association has a staff of 35. Included in its membership is the United States Civil Service and other U. S. personnel bodies, the Public Service Commission of Canada and Canadian Provinces, the Republic of the Philippines, Japan, and all the states' personnel bodies except one or two. The association and witness began work in the testing field in 1953. He has a staff of eight in this field. Preparation of the sergeants examination was accomplished by Dr. Donovan and his staff with the aid of a nationally known former Chief of Police of Chicago and University official who is a recognized authority in the field of criminology.[19] He testified the test had content validity, was job related made

use of multi-choice answers which minimizes arbitrary scoring and is the most widely used type in the public domain. He testified that job description alone is insufficient basis on which to prepare a test. He recognized the validity of service ratings but pointed out the difficulty of its subjective aspect with a weakness inviting bias and discrimination. A passing point should be flexible and points to consider are department needs and likely vacancies. However, if everyone, or substantially all, passed a test, it would raise the question of why give a test at all. Validation would have to be established by the users of the test or an in-depth study by professionals of the test users and takers.

A large percentage of the Negro police applicants failed the test as compared with the white policemen. One-hundred and eight took the test. Ninety-four were white and fourteen were black. Fifty-seven white, or 60.6% of the whites passed, and two, or 14.3% of the blacks passed.[20]

The defendant, Personnel Director Pierce, a native of Nebraska, has been with the County Personnel Board since 1947. His department has under its supervision 446 classifications and has developed the tests for most of these. He is a college graduate. It is his judgment the test is job related. Before using it he consulted the Mobile Chief of Police. Passing grade was 70, and it is his judgment by observation and study the tests have been validated as to job performance.

The Mobile Police Chief has been in that position since January 1971, and was Assistant Chief for four or five years prior thereto. He has been with the Department since 1938. During the time as Assistant Chief he served on occasion as Acting Chief. He has shown

---

18. Dr. Barrett testified he had no knowledge of any other standardized police test except those prepared by this organization.

19. Dean O. W. Wilson, University of California.

20. Plaintiffs' Exhibit No. 10.

considerable affirmative leadership demonstratively attempting to reduce the effects of discrimination in the Department.

Lt. Winstanley is in charge of the Planning Division. His work is related to assisting the Board with reference to examinations, drafting rules, regulations and procedures, short and long time plans, crime analysis reports, etc. He impressed the court as being knowledgeable and most competent. He has been on the police force since 1940 and has three years of college training. Both of these witnesses testified the sergeant examination is job related.

The defendant Personnel Board Director asserts it is his judgment, based on observation, experience and several studies aimed at measuring job performance against those promoted, the promotional tests of the past, including the sergeants tests, have established satisfactorily the predictive validity of the tests. The studies apparently were not comprehensive statistical studies.

Since 1954, the defendants, Board and Director, have made a good faith effort by intent and practice to give and grade the Mobile Police Department examination in a non-discriminatory manner.[21]

The court has examined the sergeants test.[22] The court finds the examination is job related.

The defendants, Board and Director, prior to 1953 formulated and used an application for the Police Department which included "White Males Only." They accepted only white male applications for the entrance examinations to the Police Department. This was patently discriminatory.

(2) *Seniority.* The total years in grade rather than years of service in the department is awarded points. The earliest years in grade count more than the later years, that is, fewer points per year are given. The seniority scores thus are curved. Senority is based on an eighteen year maximum. During the first 10 years credit for seniority rises rapidly but then levels off. After 10 years there is a maximum 10% increase in credit for seniority. This has been called a "learning curve." [23]

The first Negro officers were hired in 1954—17 years ago—so there are no black officers who have been on the force long enough to earn the maximum number of points. Additionally, blacks for the first years were not hired in large numbers and the program at best was a token one. Therefore, many of the Negro officers on the force now could not

---

21. The plaintiffs have had extensive discovery including receiving examination papers and examinations of blacks and whites. Although some of the plaintiffs' witnesses expressed the opinion, without supportive evidence, that the giving and grading of the examinations was prejudicial, their attorneys in open court and at pretrial stated that this was not an issue of the case and tacitly admitted they had discovered no evidence to this effect through their discovery.

22. Plaintiffs' Exhibit No. 5.

23. The method of computing seniority at the present time is to allow an officer 70 out of a possible 100 points when he has three years experience. He gets the maximum 100 points after he has been on the force 18 years. The seniority grade is actually curved, referred to as a "learning curve," so that greater weight is given to early years of service than to the later. The increment of increases are:

| Years of Service | Points |
| --- | --- |
| 3 to 3.5 | 70 |
| 3.5 to 4.5 | 75 |
| 4.5 to 5.5 | 77.5 |
| 5.5 to 6.5 | 80 |
| 6.5 to 7.5 | 82.5 |
| 7.5 to 8.5 | 85 |
| 8.5 to 9.5 | 87.5 |
| 9.5 to 10.5 | 90 |
| 10.5 to 11.5 | 92 |
| 11.5 to 12.5 | 94 |
| 12.5 to 13.5 | 95 |
| 13.5 to 14.5 | 96 |
| 14.5 to 15.5 | 97 |
| 15.5 to 16.5 | 98 |
| 16.5 to 18 | 99 |
| 18 and over | 100 |

join earlier and have not had the opportunity to earn seniority points.[24]

█ The court finds that the present seniority system constitutes racial discrimination against blacks.

(3) *Regular Service Rating.* Each officer is rated monthly by his supervisor on the basis of his performance in his present job. Every six months the ratings are averaged to arrive at the applicant's regular service rating. Before promotions, the six months service ratings are used to determine the service rating to be used for promotional purposes.

█ The officer's superior rates each man as (1) unacceptable, (2) needs to improve, (3) good, (4) better than average, (5) outstanding. The ten areas rated are: (1) care of equipment, (2) quality of work, (3) initiative and ingenuity, (4) work habits, (5) personal appearance, (6) attiude, (7) judgment, (8) reliability, (9) quantity of work, and (10) integrity and loyalty. The regular service rating, though criticized by plaintiffs or having less than perfect weights, does not appear to have had an adverse racial effect. A comparison of the regular ratings given to those who passed the last sergeants written examination reveals[25] the average of the 57 whites regular service rating was 90.08 points, while the average of the two blacks who passed was 91 points. The principal criticism the plaintiffs have is directed toward improving the form and improving the raters' ability to rate. The court con-

cludes the use of these ratings has not been racially discriminatory.

█ (4) *Special Service Ratings.* When a promotional examination is scheduled, special service ratings are prepared on the applicants. The form used is the same as that for a regular service rating. The applicant's supervisors are to indicate their opinion of the applicant's ability to perform the job to which he aspires. Plaintiffs have two basic objections to this promotional factor. First, because the rating supervisor is not required to justify the rating he gives, it is possible for prejudice to seep into the rating. Second, often the rating is not given until after it is known which officers have passed the written test. This, it is argued, allows superiors to deliberately rate black officers low if they seem likely to be promoted.

There is evidence that the special service rating has had a racially discriminatory effect. Although some whites had as large a drop as the blacks, it is significant that the only two black officers who passed the 1968 sergeants examination had drops in the special rating of 20 and 15 points from their regular rating, or an average of 17.5. The white officers had a drop average of 12.5 points. Since only two black officers passed the written tests as opposed to 57 white officers, an average of the drop loses some significance.

## CONCLUSIONS OF LAW

█ It is well established that discrimination in employment on the basis of race by a state or local government is

---

24. In all but two of the seventeen years the median age of entering blacks was higher than the median age of entering whites.

| Year | Median Age White | Median Age Black |
|------|------------------|------------------|
| 1954 | 29.62 | 29.33 |
| 1955 | 32.16 | 33.50 |
| 1956 | 26.86 | No appointments |
| 1957 | 28.43 | 31.00 |
| 1958 | No appointments | No appointments |
| 1959 | 28.83 | 37.00 |
| 1960 | 26.00 | 27.00 |
| 1961 | 29.62 | 25.20 |

| Year | Median Age White | Median Age Black |
|------|------------------|------------------|
| 1962 | 27.00 | 28.40 |
| 1963 | 29.28 | No appointments |
| 1964 | 28.04 | No appointments |
| 1965 | Not furnished | Not furnished |
| 1966 | 24.20 | 30.33 |
| 1967 | 25.40 | 32.00 |
| 1968 | 25.60 | 29.00 |
| 1969 | 25.60 | 24.66 |
| 1970 | 26.75 | 27.00 |

25. Ratings of those who failed the examination are not available.

a violation of the equal protection clause of the Fourteenth Amendment.[26]

### A. CITY OF MOBILE POLICE DEPARTMENT

■■ The Police Department has not demonstrated a sufficient justification for assigning officers to patrol areas of the city predominantly occupied by members of their own race. Similarly, the defendant has not satisfactorily justified assignment of "black" cases to Negro officers and non-assignment of blacks to "white" cases. The reason advanced—that black officers are more effective when dealing with blacks—has not been satisfactorily tested and is insufficient in the general assignment of cases. It is common knowledge, and counsel for the plaintiffs recognize, that there are instances where the race of the officer is relevant in the assignment of an officer to a task. Baker v. City of St. Petersburg, 400 F.2d 294, 300–301 (5th Cir. 1968). Likewise, insufficient justification has been demonstrated for assigning only black officers as partners of other Negroes and white officers as partners of whites to ride patrol cars. In the absence of such a showing the practice of making these segregated assignments constitutes unconstitutional racial discrimination. Baker v. St. Petersburg, supra.

The movement of black officers into the various divisions of the Department is extremely complicated. There is presently some movement in this direction which is attributable to two factors: (1) the enlightened leadership of the present Chief; in 1970 when the present Chief for a period of time served as Acting Chief, a large number of blacks were assigned to different divisions. On the return of the then Chief, there were reassignments out of these divisions. In recent months, after the installation of the present Chief, there has been movement of blacks to other divisions. (2) The pendency of this lawsuit; since the filing of this case there have been some blacks transferred to previously all white divisions.

This court's decree formulates a comprehensive plan for removing all practices of racial discrimination in the Department. This plan includes a report from the Department on the movement of blacks into the various divisions. The court recognizes the technical skills required in many of these divisions and the lack of evidence that the plaintiffs have these skills. Also, there are many complications in the movement of personnel which must necessarily follow in the wake of the comprehensive plan of the court concerning the clear cut areas of discrimination. Therefore, the court is not outlining a plan for the movement of blacks into the various divisions, but instead, the court suggests that the Department continue this movement already under way. If the reports do not show statistical improvement in this movement, the court holds that the lack of improvement will place the Department in the position of being "suspect of racial discrimination" and they will have the burden of justifying the lack of movement in this area.

In years past, particularly on the radio, when referring to blacks the word "nigger" has been used. Two or three years ago complaints were made by the blacks of this and the Department made a policy announcement and took steps to remedy this. The use of this term has

---

26. For possible exceptions and limitations see *Employment Discrimination,* supra, note 17, at 1115: "Equal protection and due process require at least that any government action which is predicated upon color must be necessary to the attainment of an overriding governmental purpose." *Citing* Loving v. Va., 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). *See also,* Baker v. City of St. Petersburg, 400 F.2d 294, 300–301 (5th Cir. 1968), which stated: "We do not hold that the assignment of a Negro officer to a particular task because he is a Negro can never be justified. [For example the undercover infiltration of an all-Negro criminal organization or plain-clothes work in an area where a white man could not pass without notice. Special assignments might also be justified during brief periods of unusually high racial tension.]"

noticeably decreased. The court recognizes that the use of this word originates in two senses: (1) often times it is corrupted and poor English in the pronunciation of the word "Negro" and, (2) an explicit derogatory term insulting and demeaning to blacks. Because of the history of servitude and discrimination against the blacks, the rightfully emerging recognition of their individual dignity, and their pride of race, many blacks are extremely sensitive when whites use this term in any sense. Therefore, the plan hereinafter set out provides for means which should speed the eradication of the use of this word.

## B. PERSONNEL BOARD AND DIRECTOR

1. Written Examination. The sergeants test used by the Board meets the test of job relatedness of Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The test has 155 multiple choice questions. It is *not* an aptitude test. Fifteen of the questions obviously have to do with supervisory duties a sergeant would be charged with. An additional 28 questions relate to knowledge desired of a qualified sergeant. One hundred twelve of the questions should be known to a good, experienced patrolman.

The principal attack of the plaintiffs on the test is that it discriminates against a socially and culturally disadvantaged minority, Negroes, because it is highly loaded with verbal skills, memory, language, reading and comprehension ability, and against poor test-takers, i. e., the level of threat is greater against the socially and culturally disadvantaged Negroes.

The attorneys for the plaintiffs urge in their brief several alternatives. One is that because of past discrimination, the defendant should enable the plaintiffs to attain parity with the white officers by requiring that the presently existing vacancies for sergeants be filled exclusively by black officers until the ratio of black sergeants to all sergeants is equal to the ratio of black patrolmen and sergeants to all patrolmen and sergeants. This would result in the promotion of approximately five black patrolmen. While recognizing government employees, as here, are not covered, (42 U.S.C.A. § 2000e(b)) plaintiffs urge the court to look to the fair employment laws, Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. §§ 2000e, 2000e–15, for guidance. The cases and law review articles on this Act provide rich provocative source material. As source material, it is significant this Act requires no preferential treatment be given minorities.[27]

"Equal protection" demands that the shackles of racial discrimination be removed and equal opportunity to com-

27. See the Anti-preferential provision, 42 U.S.C.A. 2000e–2(j). See also *Employment Discrimination*, supra, note 17, at 1114–16. "But Title VII was not simply an employment measure for blacks and other minorities. The Act's effectiveness in promoting minority employment was limited by the principle of color blindness. Just as the employer was not to discriminate against minority groups, he was also proscribed from showing preference to them. Employers could continue to set rigorous qualifications for their job openings and test for worker productivity, as long as they did so fairly. The Act thus includes an antipreferential provision, affirms the legality of professionally developed ability tests, and protects bona fide seniority systems. Help was to come to the black community, Congress reasoned, by a newfound opportunity to be judged by objective standards.

\* \* \* \* \*

"Moreover, color blindness may be constitutionally required. Equal protection and due process require at least that any government action which is predicated upon color must be necessary to the attainment of an overriding governmental purpose. It may mean even more than this; there may be no governmental purpose which can justify state action imposing burdens on the basis of race. \* \* \* When the government requires that a black man be given a job in preference to a more qualified white, harm predicated on race is clear.

\* \* \* \* \*

"The central objective of Title VII was to improve minority employment by re-

pete in the market place for jobs be effectively afforded. This court has attempted to formulate such a decree. Equal protection does not entitle superior or preferential rights to a minority or a majority.[28]

This court will not in the name of constitutional law render a judgment initiating a new paternalism under the guise of compensatory rectification or preferential treatment. Neither will this court insult the Negro plaintiffs' intelligence, disparage their initiative, their sense of responsibility, or their ability to render quality service as qualified and valued workmen by a decision which gives preferential treatment.

This decree does not attempt to formulate "instant" qualifications for any job for any person. Its purpose is to provide that all persons, white and black, be brought up to the starting line in the race for jobs and compete under equal rules. Let those who by ability, or those who are willing to pay the price by dent of dedicated hard work, or those who are willing to scratch and scramble, or those who by reason of motivation, inspiration or ambition be given the opportunity, unshackled, to outdistance—and they will —the more talented but less motivated, and move up into places of leadership and responsibility.

The plaintiffs also suggest such other schemes as an extremely low passing point and a lottery system. A flexible passing point is presently used and many more take the examination than there are vacancies. To reduce the passing point further than has been the practice would, in the court's opinion, render the test useless as a measure for promotion. A lottery system such as was used for bus drivers and collectors in Massachusetts,[29] is factually inapplicable.

■ All police officers, including the lowest patrolman, and certainly ser-

geants, are frequently faced with constitutional questions of advising defendants of their rights under the *Miranda* decision, faced with questions of probable cause in making arrests and conducting searches and seizures, swearing out warrants, legal questions concerning lineups, and identification by photographs, etc. A rudimentary knowledge of the essentials of these legal problems is necessary if the citizens are to be protected in their rights, and when violations of the law occur, successful prosecution and conviction had of the guilty parties. This takes on added significance in a day and time of rising lawlessness and criminal violence. We, the courts, have placed restrictive burdens on the law enforcement officials. We should encourage every effort to maintain and upgrade the quality of their work so that individuals may be secure in their constitutional rights and the public protected.

Reading and comprehension, memory, note taking, and reasonable use of verbal skills are essential. This sergeants test is job related. It bears a rational relationship to the ability to perform the work required.

Plaintiffs also suggest promotion by selection of the Chief of Police and other high ranking officers on the basis of a reasonable combination of regular service ratings, seniority, and an improved special rating of promotability. With the exception of the seniority factor, all other considerations are subjective which, as previously noted, is almost impossible to police. In the name of a "good cause" the door would again be opened to the spoils system which has been abolished because the result was "bad." It is the sad history of mankind that about as many evils have come about from purportedly "good" causes as from "bad" causes. Our protection from the subjective determination of good and bad is

---

quiring employers to use colorblind standards in their hiring and promoting decisions." (Footnotes omitted.)

**28.** Baker v. City of St. Petersburg, *supra*, 400 F.2d at 301. "Nothing we say is intended to suggest that the Negro of-

ficers on the police force of St. Petersburg should be given preferential treatment. They deserve only what they seek—equality."

**29.** Arrington v. Massachusetts Bay Transp. Auth., 306 F.Supp. 1355 (D.Mass.1969).

principles to govern our conduct. In this instance it is the principle of Civil Service including promotion on merit with objective testing as an integral part.

 Test validation and validation of test predictability is difficult.[30] The attorneys in their brief recognize this problem. To require a small Police Department, suffering from inadequate funding and faced with a rising crime rate, as is Mobile, to expend probably more than $30,000 to conduct a test study for examinations in an effort to produce tests to mitigate the problems of socially and culturally disadvantaged Negroes is not practical or constitutionally required. This is especially true when the studies in this field, according to the plaintiffs' expert, are inconclusive and without a clear pattern. His ideas are innovative and stimulating, but not "validated." The end result would be substitution of the unknown for the known.

The defendants are entitled to qualified personnel to serve as sergeants and in other grades. An employer hiring a stenographer has the right to employ only a stenographer who can take dictation, transcribe it, and type. The person hiring a plumber or electrician has the right to have qualified personnel repair his faucets and install his electrical equipment. Aircraft companies and passengers have a right to have qualified and trained pilots fly aircraft.[31]

Although some inequities might exist in the testing system by which most of our society measures degrees of competence, it is the best proven method that our society has been able to formulate at the present time.[32]

Prior to the institution of the Civil Service Commission for the Police Department of the City of Mobile, approximately 90% of the Police force was indicted, or under Grand Jury investigation, for corruption. Some reasonable,

30. *Employment Discrimination*, supra, note 17, at 1122: " * * * predictive validation, or anything, approaching it, is extremely difficult for the average employer. He usually finds it impossible to get a random sampling and to give similar work experience, * * * "
With reference to the interpretation of the Guidelines adopted by the Commission for Employee Selection Procedures, " * * if applied literally they would raise the cost of testing for many employers beyond tolerable limits. * * * " *Id.* at 1127.
" * * * [I]t is possible to read the Guidelines so strictly as to make testing virtually impossible. Indeed, they may have been intended to serve a scarecrow function, since the Commission itself has not applied them literally in a variety of situations." *Id.* at 1128.
" * * * [D]ifferential validity is a 'hypothesis for which, at the present time, there is insufficient factual evidence to affirm or deny with confidence' * * * One prominent psychologist has suggested that only one of twenty corporations could adequately validate a test for different races." *Citing* Barrett, Gray Areas in Black and White Testing, 46 Harv.Bus. Rev. 92, 94 (1968). *Id.* at 1129. *This is the same Barrett who is the plaintiffs' principal witness in this case.*

For discussion of validation and other aspects of hiring practices, see *Id.* at 1120–66.

31. Cooper & Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1673 (1969): " * * * [P]ractices having adverse racial impact should be permitted when they serve a significant business purpose that cannot be adequately served by a less prejudicial practice." Hereinafter cited as *Seniority and Testing.*
"Some tests have an obvious relevance to business needs and can clearly be justified for reasonable use as a criterion for employment decisions." *Id.* at 1642.

32. Seniority and Testing, supra, at 1637: "Standardized employment tests play a major role in American industry. Employers rely on tests to determine who will be hired, who will be promoted. * * * " (Footnote omitted.)
Employment Discrimination, supra, note 17, at 1121: "One survey showed that eighty-four percent of firms used personnel tests in 1963, as opposed to only sixty-four percent in 1958."

practical means of employment and promotion must be used. The Civil Service Commission with its flaws is far superior to the spoils or a lottery system. An attempt to remedy the areas of discrimination which exist in the Police Department by hiring and promoting on subjective standards would be an open invitation to a new spoils system and discrimination which would be almost impossible to police. A lottery or subjective system of promotion would be disastrous to any effort to maintain a quality police force and have promotion based on merit.

2. Regular Service Rating. To date, it has met constitutional standards. There has been no evidence that it has been used as a device to discriminate.

3. Special Service Rating. The large drop in points on the black officers' special service rating compared with their regular rating has shown the special rating to be a vehicle of discrimination.[33] Plaintiffs and defendants urge the continued use of the special service ratings. The court concludes, however, some objective controls must be placed on these subjective reports.

4. Seniority. Promotional and hiring tests and standards must not only be free of discriminatory intent, they must be free of discriminatory effect to be permissible. Seniority as a tool for promotion, demotion, and lay-offs is an established part of the American employment scene. However, the seniority factor *as used* is racially discriminatory. Because of past discrimination, Negroes entered the service later than whites, to wit, the first time in 1954, and since that time have entered at an older age, therefore, they have less seniority potential. While seniority is a common and reasonable factor to consider, some adjustment must be made to eliminate the discriminatory effect of the factor as used.[34]

It is ordered, adjudged, and decreed that the preliminary injunction restraining the defendants "until further orders of this court, from holding any examinations for promotion in the police department of the City of Mobile" dated the 18th day of May, 1971, is hereby dissolved and the defendants may give the promotional examination after this date subject only to the further injunctive provisions of this decree.

It is further ordered, adjudged, and decreed that the respondents, their successors in office, and their agents, serv-

33. Seniority and Testing, supra, note 31, at 1662: "Supervisory ratings, for example, which are possibly the single most common performance measure used in validity studies, are subject to personal prejudice."

34. "The ability of * * * black employees to improve their position by promotion or transfer was frequently handicapped by longstanding seniority * * * which restricted entry into a department to the lowest ranking job and based promotion on a seniority measure that referred to time spent in formerly white jobs." *Id.* at 1616–36.
"(i) [In] Quarles v. Phillip [Philip] Morris, Inc. [279 F.Supp. 505 (E.D.Va. 1968)] * * * Quarles, a black employee in the prefabrication department, was prevented by this system from obtaining transfer directly to the position of truck driver, a higher-rung position in a formerly all-white department, and sought injunctive relief. * * *

"The district court found that the seniority and promotional system discriminated on grounds of race, * * *." *Id.* at 1617. (Footnotes and italics omitted.)
"(ii) [In] United States v. Papermakers Local 189, [282 F.Supp. 39 (E.D.La. 1968) aff'd. 416 F.2d 980 (5th Cir. 1969)] * * *
"The defendants were ordered to abolish job seniority for promotion, demotion, and selection for training in all cases affecting blacks employed before the abolition of discrimination, and instead to institute a system of seniority based on total length of employment in the mill." *Id.* at 1619, 1621. (Footnote omitted.)
"The *Quarles* and *Local 189* opinions seem to establish a set of principles for applying the Act to seniority systems; if a system, though stated in nonracial terms and adopted without discriminatory intent, incorporates racial differences in status and systematically prefers whites to blacks without business justification, it is racially discriminatory." *Id.* at 1629.

ants or employees, are enjoined from failing to put into effect the following plan for the elimination of racial discrimination:

### I. Patrol Zone Assignments

(a) No later than the first Monday of the third month following the issuance of this decree, and continuing on the first Monday of each two months thereafter, until the plan is fully implemented, not less than eight patrol officers, which shall include an equal number of each race, shall be transferred from a patrol zone now manned by officers of their own race to a zone now manned by officers of the other race.

(b) The transferred officers referred to in (a) are to be assigned on a pro rata basis to the predominantly white or black zones of the opposite race. The present ratio is five whites to one black officer. This means four black officers may be assigned to the predominantly black zones at all times. However, under (a) supra, all black officers are to be assigned to predominantly white zones at one time or another under a rotation plan.

(c) No black officer shall be transferred back to a predominantly black zone to which he was previously assigned before the date of this decree within less than one year of (a) supra, except on written report to the court that such officer was so transferred for good, non-discriminatory reasons.

Under the above plan, all black officers will have an opportunity to serve in predominantly white zones. The court expressly allows the defendant to assign four black officers at one time or another to predominantly black zones to maintain the pro rata ratio otherwise herein set out.

### II. Two-Man Patrol Cars

(a) Trainees: In all cases where an officer and a trainee are assigned to a single patrol car, the defendant shall assign not less than one out of every five white trainees, or a portion thereof, to a black officer, but in no event less than two white trainees to two black officers and no black trainees to black officers.

(b) In all cases except trainees where two officers are assigned to a single patrol car for any reason, including physical impairment, the occupants of the patrol car shall be one white and one black.

The court does not require the Department to use two-man cars in any particular number or in any specific area. However, should defendants plan to markedly increase the number of two-man cars now in use, a statement of the reasons for such change shall be submitted to the court prior to its implementation.

### III. Assignment of Cases—Non-Uniformed Divisions

(a) The Chief of Police shall issue a directive to all supervisors responsible for the assignment of cases, stating the policy of the Police Department to be that all cases shall be assigned for investigation solely on the basis of the availability and ability of the assigned officer, without regard to his race, except in particular situations in which the race of the officer is believed to be of unique significance. In all cases in which assignments are made on the basis of, or with consideration to, the race of the officer, the assigning supervisor shall prepare a brief written statement indicating his reasons therefore, which shall be retained until permission is received from the court to destroy.

(b) It shall be the policy of the Police Department, in all cases in which detectives or other investigating officers work in teams of two or more officers, to have at least one officer of each race assigned to such teams, insofar as the number of available men may permit, except in particular situations in which the race of the officer is believed to be of unique significance in which event applicable provisions of III. (a), supra, shall apply.

## IV. Rotation Among Divisions

It shall be the policy of the Police Department to permit officers to serve in as many of the divisions of the Department as is feasible and, in particular, to permit black officers the opportunity to serve in divisions other than patrol. Each six months hereafter the Chief of Police shall submit a written report to this court reflecting the movement of black officers among the different divisions for the preceding six months. In the event there has been no improvement in the movement of black officers among the different divisions during that six months, the court shall consider the failure to improve the movement from patrol as prima facie evidence of discrimination and the burden shall be placed on the defendants to overcome this presumption.

## V. Policy on Racial Discrimination

The Chief of Police shall instruct all personnel of the Department, both sworn officers and civilians, that expressions of racial prejudice in word, especially the use of the word "nigger," or deed, will not be tolerated. Any reported violations of this policy shall be investigated, and if substantiated, the offender shall be appropriately disciplined.

## VI. Instruction in Intergroup Relations

Within five months from the date of this order the Personnel Board for the County of Mobile, Alabama, and the Director of Personnel, George H. Pierce, individually and as Director of the Personnel Board of Mobile County, and their successors in office, shall prepare, in consultation with the Mobile City Police Department, a course of study for Police officers in intergroup relations of not less than ten classroom hours. The course shall be prepared in consultation with national and local experts in the field and a plan, including a detailed course outline and effective provisions for attendance, shall be submitted to the court. No later than one year from the date of this order the course shall be given to all sworn officers of the Department of all ranks. Thereafter, the course shall be given to all new recruits and a short version shall be included in the regular course of in-service training for incumbent officers.

## VII. Recruitment Program

The Police Department and the Personnel Board shall institute an affirmative recruitment program to obtain new recruits to fill the existing vacancies. The program shall be prepared in consultation with black leaders in the City of Mobile, and shall include a large measure of advertising and promotions directed toward the black community. All advertising shall include the statement "Equal Opportunity Employer." All pictorial advertisements shall depict officers of both races. The plaintiffs are directed to participate in the development and implementation of such program. A plan for such recruitment program shall be submitted to the court within three months of the date of this order.

## VIII. Seniority

(a) In the promotional system seniority will be calculated on a maximum basis of 10 years. The defendants Personnel Board and Director, Mr. Pierce, or their successors in office, shall calculate a "curve of learning" on the same basis as under the present maximum of 18 years, that is, it is to be adjusted to a 10 year period.

(b) In calculating seniority to promotion to ranks above sergeant the score should be based on seniority in total service, hereinafter referred to as Department seniority, rather than in rank, when Negroes, an "affected class" as hereinafter defined, compete against whites.

(c) (1) Seniority in the Police Department will be the test for advancement above the rank of sergeant or for lay-offs whenever the "affected class" employees compete with other employees.

(2) Rank seniority will be retained whenever whites compete against each other in any of the above situations.

(3) Rank seniority will be retained whenever any of the "affected class" compete against each other in any of the above situations.

(4) "Affected class" as used in VIII. (b) and (c) (1) (3), shall mean Negroes employed prior to September 9, 1971. It is provided, however, that although the "affected class" will compete against whites on Police Department seniority regardless of time in rank, members of the "affected class" and whites are not eligible to take the promotional examination above sergeant until after compliance with the existing rule of a one year probationary term in rank.

(5) The above ordered Police Department seniority provisions governing the competition between Negroes and whites shall be terminated in ten years from September 9, 1971.[35]

## IX. Service Ratings

(a) Special service rating.[36]

(1) The special service rating should be given on a regular six monthly basis by the Police Department and retained in the Department regardless of whether those officers being rated are then seeking promotion or whether any promotions are contemplated in the near future. The person giving the rating should be required to state not only whether he believes the officer would serve well in the next rank but why he holds such belief. He is also required to explain any marked discrepancy between his evaluation of the individual's performance or regular service rating and his special service rating.

(2) After an announced examination for promotion and after the termination of the application date, a special service rating will be made based on the previous special service ratings previously given plus a special rating for the interval since the last special rating and the date of this rating. The rating is to be completed and given to the Personnel Board and Director before the examination is given. These ratings will be given by five persons who shall include the Chief of the Police Department, the two most immediate current supervisors, and two others requested by the applicant from among the other supervisors he has had.

(3) It is important that the raters support their evaluations, in addition to the form used, with narrative reasons for their judgment of what sort of sergeant or superior officer the man would be. A form for the preparation of the ratings, including evaluation, is to be submitted to the court for approval before it is used. Instruction in rating should be given to all supervisory officers and the ratings they prepare regularly reviewed and initialed by the reviewer.

(4) In the semi-annual reports to the court the defendants will include a copy of the ratings given by all supervisors for the period covered, under seal to be opened only on the orders of the court.

## X. Written Tests

(1) Not less than once each year hereafter from the date of this decree the defendants are to submit a written re-

---

35. The court has used as a guideline a negotiated industry agreement on seniority where there had been discrimination against blacks. The agreement was entered into after the Office of Federal Contract Compliance had advised industry and labor unions with whom they had a labor agreement that they were in noncompliance with Executive Order #246. The approved agreement between the industry and the labor unions were acceptable to the Office of Federal Contract Compliance. Their agreement is Plain-tiffs' Exhibit No. 3 in a pending case before this court, to wit, Fluker, et al. v. Locals #265 and #940, United Papermakers, Civil Action No. 5839–70, and Herron, et al. v. United Papermakers and Paperworkers, Civil Action No. 5665–69, a copy of which is attached to this decree as Appendix A, excepting the signatures of all the particular mills.

36. Sometimes called a potential promotability service rating.

port to the court which consists of a statistical study of promoted officers which will show a comparison between their examination grade and their regular service or performance ratings.

(2) No less than seven days prior to a promotional examination the Personnel Board and Director, or their successors in office, will have prepared and give a remedial course for blacks and whites in non-segregated classes, with a "dummy" examination given. The "dummy" examination will be graded and an opportunity given to the test taker to see the grade, the test paper, and discuss all areas of the examination with a competent member of the Police Academy, Planning or Training staffs, and a member of the Personnel Board staff. The defendants are to maintain a register of those who attend the remedial course and take the "dummy" test together with the grade.

### XI. Reports to the Court

Six months after the date of this order and at six month intervals thereafter until further orders of the court, defendants shall submit detailed reports to the court regarding the implementation of this order.

Costs will be taxed at a later date.

### APPENDIX A

### MEMORANDUM OF UNDERSTAND-ING

THIS MEMORANDUM OF UNDER-STANDING, made by and between the Southern Kraft Division of International Paper Company and The United Papermakers and Paperworkers, The International Brotherhood of Pulp, Sulphite and Paper Mill Workers, and The International Brotherhood of Electrical Workers,

### WITNESSETH THAT:

WHEREAS, the Office of Federal Contract Compliance has advised the parties that certain practices under the existing Labor Agreement are considered to be in non-compliance with Executive Order 11246; and

WHEREAS, the parties have duly met to discuss and negotiate changes to the practices under the existing Labor Agreement; and

WHEREAS, the parties have been informed that the agreed upon changes are acceptable to the Office of Federal Contract Compliance; and

WHEREAS, there is now in existence between the parties hereto a Labor Agreement effective from June 1, 1967 to May 31, 1970, recognizing the Unions as the exclusive representative for collective bargaining of all the Production and Maintenance employees in the Bastrop Mill, Camden Mill, Georgetown Mill, Louisiana Mill, Mobile Mill, (Mobile Bag Factory), Moss Point Mill, Natchez Mill, Panama City Mill, Pine Bluff Mill, and Springhill Mill of the Southern Kraft Division of the Company, with certain specified exclusions:

IT IS AGREED between the parties hereto as follows:

THE FOLLOWING PROVISIONS ARE APPLICABLE TO PRODUCTION LINES OF PROGRESSION ONLY.

I. A. Acceptance of mill seniority as the test for advancement or demotion within progression lines or recall to progression lines or transfer from one progression line to another, or layoff, whenever Negro employees compete with other employees.

B. (1) Retention of contract seniority whenever Whites compete against each other in any of the above situations.

(2) Retention of contract seniority whenever Negroes compete against each other in any of the above situations.

C. The acceptance of mill seniority, as outlined above, as the guiding principle when Whites and Negroes compete shall be subject to agreement with the Company as follows:

(1) All employees in the affected class as identified in Item C (4)

below will be contacted for the purpose of discussing with them their desires for transfer to some other line of progression or advancement into a line of progression. Written applications will be prepared for those expressing an interest in such transfer or advancement. When vacancies occur all employees in or out of the affected class having applied for transfer or advancement will be considered on the basis of seniority and qualifications as otherwise provided for herein. Permanent vacancies in the beginning job of lines of progression will be posted on bulletin boards in all departments for at least one week with the understanding that a copy of the notice will be given to each local union.

(2) *All* current employees will be allowed to transfer to or advance into any line of progression if his qualifications are as high as the minimally qualified employee currently working in the line.

(3) Red circling of rates to be provided for first transfer of any current employee under the following conditions:

(a) The employee must have a permanent rate of less than $3.00 per hour.

(b) The employee must have made application for the transfer involved as provided in Paragraph I. C (1) above within 6 months of the date of this Memorandum.

(c) (1) Red circling shall end for an employee who is transferred to or advanced into a line of progression if such employee fails to qualify after a reasonable trial period.

(2) Red circling shall end for an employee who waives a promotion in the line of progression to which he transfers or if the employee is disqualified for promotion,

temporary or permanent, to a higher job to which he would otherwise move.

(4) The "affected class" for purposes of determining mill seniority competition shall be limited to:

(a) Negroes employed prior to September 1, 1962, and

(b) Negroes employed since September 1, 1962 but initially placed in a job or line of progression formerly considered as an all Negro job or line of progression.

(5) Mill seniority provisions governing the competition between Negroes and Whites shall be terminated in five (5) years subject to the approval of the apropriate government agency, if any.

II. Revisions in progression lines shall be referred to negotiations at the mill level between local management and local unions, such negotiations to involve the following items in the order of their priority:

A. Merging progression lines. Agreement to be reached within 90 days following ratification of this Memorandum.

B. Within 30 days after the lines of progression have been merged, the appropriate representatives of the local unions and the Company shall meet to examine the shortening of lines of progression and determine those jobs, if any, which may be skipped in advancing within or transferring between lines of progression.

III. If any Federal Court of Appeals or the Supreme Court of the United States shall hereafter determine that the government may not lawfully impose seniority standards upon the parties to a collective bargaining agreement, this Memorandum of Understanding shall immediately revert to

the terms of the June 1, 1967 Labor Agreement.

SIGNED this 2nd day of August, 1968.

International Paper Company
Southern Kraft Division

By (s) E. E. Ellis, Jr.,
Vice President

The United Papermakers and Paperworkers

By (s) W. L. Franks
By (s) David W. Gordon

The International Brotherhood of Pulp, Sulphite and Paper Mill Workers

By (s) Jesse W. Whiddon, Sr.

By (s) Hagen E. Glenn

The International Brotherhood of Electrical Workers